IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: § <br> § **Chapter 11** <br> **FREE SPEECH SYSTEMS LLC** § <br> § **Bankruptcy Case No. 22-60043** <br> Debtor. § <br> § | |
| **FREE SPEECH SYSTEMS LLC** § <br> § <br> Plaintiff, § <br> § <br> v. § **Adversary No. 23-03127** <br> § <br> **PQPR HOLDINGS LIMITED LLC, JLJR** § <br> **HOLDINGS LLC, PLJR HOLDINGS LLC,** § <br> **AEJ AUSTIN HOLDINGS LLC, AEJ 2018** § <br> **TRUST, CAROL JONES and DAVID JONES** § <br> § <br> Defendants. § | |

**PQPR HOLDINGS LIMITED LLC'S, JLJR HOLDINGS LLC'S
AND PLJR HOLDINGS LLC'S SUPPLEMENTAL ANSWER
WITH AFFIRMATIVE DEFENSES**

PQPR Holdings Limited LLC ("PQPR"), JLJR Holdings LLC ("JLJR"), and PLJR Holdings LLC ("PLJR") (collectively, "Defendants") file this supplemental answer to Free Speech System LLC's ("FSS" or "Debtor") amended Complaint (the "Complaint") for the purpose of asserting affirmative defenses to FSS' claims against PQPR, JLJR, and PLJR.

I.   PRELIMINARY STATEMENT REGARDING AFFIRMATIVE DEFENSES

1.   PQPR and FSS have, since inception, been separate legal entities with separate ownership structures, separate books that recorded transactions contemporaneously, and separate creditors. The entities never represented themselves to creditors as the same entity. The Internal Revenue Service, after audit, even affirmed the separate nature of PQPR and FSS and the separate nature of their finances. At times, each entity shared some measure of common management and

shared a bookkeeper. The result of such common management was that PQPR was disadvantaged in favor of FSS, not FSS being disadvantaged by PQPR.

2. FSS is and always has been an entity which produces content and sells advertising. PQPR is and always has been an entity which purchases nutritional supplements and sells those supplements. PQPR uses its industry knowledge in all aspects of its business, including purchasing, labeling, proper storage to comply with regulations, and marketing to avoid regulatory issues.

3. PQPR purchased and paid for product from third parties. That PQPR-owned product was marketed by FSS which then owed (and still owes) PQPR for the funds collected for the sale of PQPR products. The transactions between PQPR and FSS were recorded contemporaneously. While FSS successfully sold PQPR's products as a sales representative, it fell behind in remitting PQPR's funds to PQPR. PQPR showed the sales as revenues in the PQPR tax returns. The debt owed by FSS to PQPR was reviewed by an outside accountant in 2020, and the amount shown as owing by FSS to PQPR (on each entity's books) was affirmed. The debt owing to PQPR was documented in two separate notes and secured by a grant of a security interest in virtually all assets of FSS. At that time, PQPR was the sole supplier of nutritional supplements to FSS. PQPR was unwilling to continue to advance credit to FSS absent the signing of the notes and security agreement.

4. Subsequent to the grant of the security agreement, FSS continued to incur additional debt to PQPR. PQPR continued to purchase product for FSS to sell only because of the existence of the security agreement.

5. FSS was able to run up its debt to PQPR only because FSS was the recipient of credit card payments from the credit card processor for customers' purchases of PQPR products.

Because of the reputation of Alex Jones, the sole owner of FSS who was entangled in a series of high-profile matters that brought him into disrepute, FSS was "deplatformed" by the credit card processor.  By this time, it was also apparent that FSS could not be trusted to timely pay PQPR.  Consequently, by mutual agreement by FSS and PQPR, a third party was engaged to serve as an intermediary and to collect the credit card receivables.  That entity held the received funds in trust and disbursed the payments to each of FSS and PQPR.

6. Through 2021, FSS sold PQPR's products and collected sales revenue of almost $300 million.  During that period, FSS charged PQPR approximately $94.2 million for advertising, fulfillment, and administrative charges.  PQPR paid vendors and incurred other costs of approximately $95 million.  PQPR's gross margin on sales after advertising was approximately 36 percent, on an accrual basis.  Gross margin, when calculated on a cash basis, is approximately 21%.  That is the amount of cash profit PQPR realized from its dealings with FSS.  Such margins are equivalent to industry standards.

## II. AFFIRMATIVE DEFENSES FOR ALL DEFENDANTS

7. Subsequent new value:   PQPR advanced new value to FSS after the alleged transfers of property of the estate.

8. Estoppel and Waiver:  After November of 2021 and continuing to this date, FSS agreed that PQPR's interest in the amounts received were held in trust for PQPR's benefit.  Thus, no transfers of property of the estate existed after such time.

9. Reasonably Equivalent Value:   The grant of the security interest was not a fraudulent transfer because, as a matter of law, reasonably equivalent value was received by FSS. *See First National Bank of Seminole v Hooper*, 194 S.W. 3d 83 (Tex. 2003).

10. Solvency:  FSS was solvent at the time of the alleged transfers.

11. Good faith: Defendants were good faith transferees.

Dated: November 6, 2023          Respectfully submitted,

By: */s/ Stephen W. Lemmon*
Stephen W. Lemmon
Texas Bar No. 12194500
STREUSAND, LANDON, OZBURN & LEMMON, LLP
1801 S. Mopac Expressway, Ste. 320
Austin, Texas 78746
Telephone: (512) 236-9900
Facsimile: (512) 236-9904
lemmon@slollp.com

ATTORNEYS FOR DEFENDANTS PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS, LLC, AND PLJR HOLDINGS, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing instrument has been served on this 6th day of November 2023, served via this Court's CM/ECF notification system to those parties registered for service upon filing of the same.

*/s/ Stephen W. Lemmon*
Stephen W. Lemmon