IN THE UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>**FREE SPEECH SYSTEMS LLC**<br><br>Debtor. | § § § § § § § | **Chapter 11**<br><br>**Bankruptcy Case No. 22-60043** |
| **FREE SPEECH SYSTEMS LLC**<br><br>Plaintiff,<br><br>v.<br><br>**PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS LLC, PLJR HOLDINGS LLC, AEJ AUSTIN HOLDINGS LLC, AEJ 2018 TRUST, CAROL JONES and DAVID JONES**<br><br>Defendants. | § § § § § § § § § § § § § § | **Adversary No. 23-03127** |

**PQPR HOLDINGS LIMITED LLC'S, JLJR HOLDINGS LLC'S, AND PLJR HOLDINGS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

PQPR Holdings Limited LLC ("PQPR"), JLJR Holdings LLC ("JLJR"), and PLJR Holdings LLC ("PLJR") (collectively, "Defendants") hereby file this PQPR Holdings Limited LLC's, JLJR Holdings LLC's, and PLJR Holdings LLC's Motion For Partial Summary Judgment (the "Motion") in support thereof states the follows:

### I.   OVERVIEW

1.   Since at least 2014, PQPR and FSS have been separate companies, with separate sets of creditors, and separate books and records. PQPR is an insider, but was controlled by separate management from FSS. While there is some commonality in the ownership, the companies are not the same.

2. PQPR purchased and paid for product from third parties. That product was marketed by FSS which then owed (and still owes) funds to PQPR. The transactions between PQPR and FSS were recorded contemporaneously. While FSS successfully sold the products, it fell behind in paying PQPR. The debt owed by FSS to PQPR was reviewed by an outside accountant in 2020, and the amount shown as owing by FSS to PQPR (on each entity's books) was affirmed. The debt owing to PQPR was documented in two separate notes, and secured by a grant of a security interest in virtually all property of FSS. At that time, PQPR was virtually the sole supplier to FSS. PQPR was unwilling to continue to advance credit to FSS absent the signing of the notes and security agreement.

3. Subsequent to the grant of the security agreement, FSS continued to incur additional debt to PQPR. PQPR continued to purchase product and to sell such product to FSS only because of the existence of the security agreement.

4. FSS has brought a series of claims against PQPR, claiming that the grant of the security interest, as well as payments made to PQPR were fraudulent transfers and preferences. However, the fact remains that since the time of the grant of the security interest, FSS has incurred additional net debt to PQPR of $6,308,483.16. PQPR therefore seeks a partial summary judgment that, at a minimum, it possesses a first lien security interest in the amount of at least $6,308,483.16.

## II.   BACKGROUND FACTS

5. FSS was incorporated in 2007.

6. PQPR was formed and registered with the Texas Secretary of State on October 9, 2013.

7. FSS is and always was wholly owned by Alex Jones.

8. PQPR is owned by PLJR and JLJR. PLJR is owned by AEJ Austin Holdings LLC, which owns a 90% membership interest, and Carol Jones, who owns the remaining 10% membership interest. AEJ is owned by Alex Jones. JLJR is owned by Carol Jones and David Jones. The net effect of the ownership structure is that Alex Jones indirectly owns 72% of PQPR via his indirect 90% ownership in PLJR.

9. However, Alex Jones does not and has never acted as a manager or officer of PQPR. Alex Jones has not ever directed the business operations of PQPR. Instead, Carol Jones is the manager of JLJR. David Jones has acted as the person who manages PQPR. Carol and David Jones are the parents of Alex Jones.

10. PQPR purchased and paid for product from third parties. That product was marketed by FSS which then owed (and still owes) funds to PQPR. The transactions between PQPR and FSS were recorded contemporaneously. FSS initially paid PQPR timely in full for its purchases of product from PQPR. However, while FSS successfully sold the products, it eventually fell behind in paying PQPR. PQPR showed the sales to FSS as revenues in the PQPR tax returns. The debt owed by FSS to PQPR was reviewed by an outside accountant in 2020, and the amount shown as owing by FSS to PQPR (on each entity's books) was affirmed. The debt owing to PQPR was documented in two separate notes. These two notes, the first note dated August 13 2020 and the second note dated November 10, 2021, secured the debt by a grant of a security interest in viritually all property of FSS. *See* Exhibit A, Affidavit of Robert Roe, paras. 9 and 12. At that time, PQPR was virtually the sole supplier to FSS. PQPR was unwilling to continue to advance credit to FSS absent the signing of the notes and security agreement.

11. PQPR and FSS executed a security agreement (the "Security Agreement"), which was entered into and made effective as of August 13, 2020 (the "Effective Date") relating to both

antecedent debts as well as later extensions of credit. A UCC 1 Financing Statement was filed on November 18, 2020 reflecting the grant of the Security Agreement.

12. Subsequent to the grant of the Security Agreement, FSS continued to incur additional debt to PQPR. PQPR continued to purchase product and to sell such product to FSS only because of the existence of the Security Agreement. The additional amount of debt incurred by FSS and owing to PQPR after the grant of the security interest is $6,308,483.16. This is a net number, after taking into account the amount of charges from FSS back to PQPR. In other words, it is unquestionable that PQPR gave new and additional value to FSS in the amount of at least $6,308,483.16 after the Security Agreement was executed.

13. FSS was able to run up its debt to PQPR only because FSS was the recipient of credit card payments from the credit card processor. Because of the reputation of Alex Jones, the sole owner of FSS, who was entangled in a series of high-profile matters which brought him into disrepute, FSS was "de-platformed" by the credit card processor. By this time, it was also apparent that FSS could not be trusted to timely pay PQPR. Consequently, a third party was engaged to serve as an intermediary and to collect the credit card receivables. That entity held received funds in trust and disbursed the payments to each of FSS and PQPR.

### III.   SUMMARY JUDGMENT EVIDENCE

14. In support of the Motion, the following exhibits are incorporated herein for all purposes:

**Exhibit A**   Affidavit of Robert Roe

**Exhibit B**   Affidavit of David Jones, DDS

**ARGUMENT**

**IV.     SUMMARY JUDGMENT STANDARD**

15.     Summary judgment is proper in a case in which there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013). The burden of the movant is to present the basis for the motion and the elements of the claims that the nonmovant party will be unable to establish a genuine dispute of material fact. *Sevick v. Univ. of Texas Houston Health Sci. Ctr.*, No. CV H-16-2803, 2018 WL 6619748, 1 (S.D. Tex. Jan. 23, 2018). A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine dispute of material fact by either (1) submitting summary-judgment evidence that negates the existence of a material element of the plaintiff's claim or (2) showing there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.*, 477 U.S. at 322–23. The Defendants, in this case, can meet this burden, as a matter of law, with respect to $6,308,483.16 of value advanced from Debtor's estate based upon a preexisting security agreement.

**V.     THE SECURITY AGREEMENT COVERS LATER EXTENSIONS OF CREDIT**

16.     First, looking to the underlying agreements, the Security Agreement related to all debts then existing or created afterwards.

17.     The Security Agreement created a security interest in the following:

> "[...] performance and payment that certain promissory note of even date herewith in the original principal amount of Twenty Nine Million Five Hundred Eighty Eight Thousand Dollars executed by Debtor in favor of Secured Party as it may be amended or modified (the "Note") and any and all other obligations of Debtor to Secured Party of any kind or character, now owed *or hereafter arising* (collectively, the "Obligations")."

5

(emphasis added).

18. Under the Security Agreement, FSS pledged to PQPR a security interest in the following (hereafter, the "Collateral"):

> (1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and
>
> (2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

19. The Security Agreement states that the law governing the secured transaction will be the laws of the State of Texas. Texas allows for security agreements to include future advance clauses where the collateral secures future advances or other value. *In re Guiles*, 580 B.R. 466, 470 (Bankr. W.D. Tex. 2017); *see* also, Tex. Bus. & Com. Code Ann. § 9.204(c) (West 2001).

20. The principal test for determining whether a transaction is to be treated as a security interest is whether "the transaction intended to have effect as security." *In re ProvideRx of Grapevine, LLC*, 507 B.R. 132, 153 (Bankr. N.D. Tex. 2014) (quoting *Looney v. Nuss (In re Looney)*, 545 F.2d 916, 918 (5th Cir.1977)). Here, the Security Agreement expressly and unambiguously creates a security interest in any and all other obligations "now owed or hereafter arising" that applies to future extensions of credit. Any further extension of credit to the debtor by a lender is deemed future indebtedness reasonably contemplated by the parties when they execute a future advance clause. *Kimbell Foods, Inc. v. Republic Nat. Bank of Dallas*, 557 F.2d

491, 495 (5th Cir. 1977), aff'd sub nom. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S. Ct. 1448, 59 L. Ed. 2d 711 (1979).

21. The Security Agreement expressly provides that covered obligations include both existing and future loans made by the secured party to the Debtor. *In re CTS Truss, Inc.,* No. 7-85-00172-11, 1986 WL 79426, 1 (W.D. Tex. Oct. 7, 1986)(finding that notes were covered by security agreements based in part on the inclusion of a clause providing that obligations covered by it include future as well as existing loans made by the secured party to the debtor). In fact, Debtor acknowledges that the Security Agreement was intended to and did apply to future loan arrangements. Amend. Compl., at ¶ 33, Dkt. No. 5("[t]he 2021 Secured Note is secured by the 2020 Security Agreement and the 2020 UCC Financing Statement").

22. The $6,308,483.16 (hereinafter, the "Subsequent Account Balance") advanced under the existing Security Agreement was reasonably contemplated, as evidenced by the clear language of the Security Agreement and the pattern of business affairs prior to these transfers.

## VI.   AT THE VERY LEAST, THE SUBSEQUENT ACCOUNT BALANCE IS A SECURED DEBT

23. PQPR contends that the transfers that Debtor seeks to avoid in this action are not subject to avoidance under 11 U.S.C. § 548, nor are the transfers voidable under the Texas Uniform Fraudulent Transfer Act ("TUFTA") as the transfers were in exchange for reasonably equivalent value provided for under the Security Agreement.[1]

---

[1] As a matter of law, a transfers made to secure a valid antecedent debt is an exchange of reasonably equivalent value. *First Nat. Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86-87 (Tex. 2003) (a deed of trust lien was reasonably equivalent value as a matter of law and claims under TUFTA section 24.005 or 24.006 could not be sustained). This principle is equally applicable to section 548 claims; *See, In re Arabella Petroleum Co., LLC*, 647 B.R. 851 (Bankr. W.D. Tex. 2022) (noting that the TUFTA and section 548 "are for all practical purposes identical" and that "a transfer made for or on account of an antecedent debt is by definition for a reasonably equivalent value) and *In re AppliedTheory Corp.*, 323 B.R. 838, 842 (Bankr. S.D.N.Y.), aff'd, 330 B.R. 362 (S.D.N.Y. 2005). The full amount in controversy is secured under the Security Agreement, both then existing debts and future extensions of credit. The rights of PQPR, as a secured creditor holding a perfected security

24. Notwithstanding PQPR's view that the full amount owing to PRQPR is secured and not subject to avoidance, this motion seeks to establish that, at a minimum, the Subsequent Account Balance is secured debt and is not avoidable due to the exchange of reasonably equivalent value. Additionally, even if it is shown that a debtor made a transfer with fraudulent intent, "the transfer is nevertheless not avoidable against a person who received the transfer in good faith and for 'a reasonably equivalent value.'" *First Nat. Bank of Seminole v. Hooper*, 104 S.W.3d 83, 85 (Tex. 2003)(quoting Tex. Bus. & Com. Code Ann. § 24.009).[2]

25. The Subsequent Account Balance was a later extension of credit contemplated and provided for by the clear language of the Security Agreement. By granting a security interest in respect to the future extensions of credit, the Debtor necessarily received reasonably equivalent value by virtue of the fact that the Debtor's receipt of the Subsequent Account Balance was exchanged for said security interest. Stated differently, the security interest did not provide PQPR with a right to anything more than what it provided, and Debtor's liabilities did not increase due to the existing security interest. *In re AppliedTheory Corp.*, 323 B.R. 838, 841 (Bankr. S.D.N.Y.), aff'd, 330 B.R. 362 (S.D.N.Y. 2005) (holding that a debtor receives reasonably equivalent value in exchange for its granting the security interest).

26. Thus, since the parties, as a matter of law, received a reasonably equivalent value in exchange for the subsequent advances, the Debtor's 11 U.S.C. § 548 and TUFTA claims relating to the Subsequent Account Balance cannot prevail, and summary judgment on these claims is appropriate.

---

interest in Collateral is not subject to avoidance under a theory of constructive fraudulent transfer because, as a matter of law, reasonably equivalent value was provided.

[2] The *First Nat. Bank of Seminole* decision involved an identical TUFTA fraudulent transfer claim to the one brought against PQPR. PQPR contends that the same principle applies to section 548 claims since the TUFTA was modeled on section 548(a)(1). *See Janvey v. Democratic Senatorial Campaign Comm., Inc.,* 712 F.3d 185, 194 (5th Cir. 2013); *see also*, *In re Arabella Petroleum Co., LLC*, 647 B.R. 851, 868–69 (Bankr. W.D. Tex. 2022)

## VII.   THE SUBSEQUENT ACCOUNT BALANCE IS NOT SUBJECT TO SUBORDINATION UNDER 11 U.S.C. § 510.

27.   Equitable subordination is appropriate when "(1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *In re SI Restructuring, Inc.*, 532 F.3d 355, 360 (5th Cir. 2008). Additionally, claims should be subordinated only to the extent necessary to offset the harm that the debtor and its creditors suffered on account of the inequitable conduct. *Id.* (citing *Matter of Mobile Steel Co.,* 563 F.2d 692, 706 (5th Cir. 1977)).

28.   Even if the PQPR or David Jones were found to be insiders or acted unfairly, equitable subordination of their claims to those advanced by other creditors still cannot be justified because Debtor cannot make a factual showing that any of the alleged improprieties injured FSS or its other creditors. *Matter of Mobile Steel Co.,* 563 F.2d 692, 706 (5th Cir. 1977). Equitable subordination is remedial, not penal, and in the absence of actual harm, equitable subordination is inappropriate. *In re SI Restructuring, Inc.,* 532 F.3d 355, 361 (5th Cir. 2008).

29.   Similar claims were raised in *In re SI Restructuring, Inc.,* 532 F.3d 355 (5th Cir. 2008) in which alleged insiders of the business had engaged in inequitable conduct in the manner in which they presented loans to the board of directors as the only available option at the eleventh hour that granted themselves security for their preexisting, contingent indebtedness on their guarantees of corporate obligations. *Id.* at 359. The Fifth Circuit concluded there was no finding of harm necessary to sustain the claim since the proceeds of the underlying loan were used to pay unsecured creditors and keep the company in operation, which would ultimately benefit the class allegedly harmed by the transaction, even if those unsecured creditors did not

receive any payment. So, as a matter of law, there cannot be "harm" under the Fifth Circuit's standard as to the Subsequent Account Balance.

30. Here, even assuming PQPR was deemed to be an insider or that PQPR engaged in inequitable conduct and gained an unfair advantage, the Debtor cannot show actual injury, and the record does not support a finding that the Subsequent Account Balance harmed either the debtor or other creditors. Instead, the record shows that the secured advance of credit did not diminish the estate and was necessary to keep the company in operation. The Debtor's subordination claim should be denied.

## VIII.   CONCLUSION AND PRAYER

The Debtor entered into a contract with Defendants in the form of the Security Agreement. Pursuant to the Security Agreement, a security interest was created in any and all obligations thereafter arising. The Security Agreement provides for later extensions of credit to be covered under the agreement and secured thereunder. There is no issue of material fact that would preclude judgment on the determination that the Subsequent Account Balance is secured under the Security Agreement, that Debtor's claim for Equitable Subordination under 11 U.S.C. § 510 be denied, or that Debtor's Recovery of Fraudulent Transfers under 11 U.S.C. §§ 544 and 548 must be denied as a matter of law.

Defendants, therefore, request that the Court enter judgment in favor of the Defendants that the $6,308,483.16 is secured and deny Debtor's TUFTA and 11 U.S.C. claims.

Dated:  April 19, 2024	Respectfully Submitted,


By: */s/ Stephen W. Lemmon*
	Stephen W. Lemmon
	State Bar No. 12194500
	STREUSAND, LANDON, OZBURN
	& LEMMON LLP
	1801 S. Mopac Expressway, Suite 320
	Austin, Texas 78746
	Telephone: (512) 236-9900
	Facsimile   (512) 236-9904
	Lemmon@slollp.com


**ATTORNEYS FOR DEFENDANTS PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS, LLC, AND PLJR HOLDINGS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing instrument has been served on this 19th day of April 2024, served via this Court's CM/ECF notification system to those parties registered for service upon filing of the same.

*/s/ Stephen W. Lemmon*
Stephen W. Lemmon