REDACTED COPY

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| FREE SPEECH SYSTEMS, | Case No. 22-60043 (CML) |
| Debtor. | |

| | |
|---|---|
| FREE SPEECH SYSTEMS LLC, | |
| Plaintiff, | |
| v. | Adversary No. 23-03127 |
| PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS LLC, PLJR HOLDINGS LLC, AEJ AUSTIN HOLDINGS LLC, AEJ 2018 TRUST, CAROL JONES and DAVID JONES, | |
| Defendants. | |

---

**MEMORANDUM OF LAW OF THE SANDY HOOK FAMILIES IN
OPPOSITION TO PQPR HOLDINGS LIMITED LLC'S, JLJR HOLDINGS LLC'S,
AND PLJR HOLDINGS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

The Connecticut Families[1] and the Texas Families[2] (together, the "Sandy Hook Families"),

as intervenors in the above-captioned adversary proceeding, submit the following Memorandum

of Law in Opposition (the "Opposition") to *PQPR Holdings Limited LLC's, JLJR Holdings LLC's,*

*and PLJR Holdings LLC's Motion for Partial Summary Judgment* [Docket No. 44] (the "Motion")

---

[1]     The "Connecticut Families" are Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash.

[2]     The "Texas Families" are Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine.[3]     This Opposition is filed under seal pursuant to the so-ordered Stipulated Confidentiality Agreement and Protective Order, Case No. 22-60043 [Docket 461].  The Sandy Hook families will publicly file a redacted version of this Opposition as soon as practicable.

REDACTED COPY

filed by PQPR Holdings Limited LLC, JLJR Holdings LLC, and PLJR Holdings LLC (collectively, "Defendants").[3]

### Preliminary Statement[4]

1.      Defendants ask the Court to validate a $6.3 million secured claim, arising from a transaction between Jones and his father consummated while Jones and FSS were soon to face millions in legal judgments, without providing **any** admissible evidence—much less credible evidence—to substantiate this asserted secured claim.  This Alleged Claim would take millions of dollars directly from FSS's primary creditors—the Sandy Hook Families—funneling it instead to Jones and his parents.  The "numerous instances of apparent financial gymnastics" that gave rise to the Alleged Claim are well-documented in the Subchapter V Trustee's Report, an independent, court-ordered investigation that concluded PQPR's Alleged Claim should be disallowed or subordinated to the claims of unsecured creditors in this case.  FSS has also filed this adversary proceeding challenging the security interest underlying the Alleged Claim and related incurrence of debt as a fraudulent transfer.  After stonewalling any meaningful discovery in this case, Defendants simply ignore the significant factual issues raised by these filings, and ask the Court to disregard the Subchapter V Trustee Report and grant summary judgment on the Alleged Claim.  The Court should decline.

2.      Two critical premises underlie the validity of the $6.3 million Alleged Claim—and serious, genuine disputes of material fact exist as to both premises.  *First*, the Motion simply assumes—without providing any evidence—that the Security Agreement granting PQPR its

---

3       This Opposition is filed under seal pursuant to the so-ordered Stipulated Confidentiality Agreement and Protective Order, Case No. 22-60043 [Docket 461].  The Sandy Hook families will publicly file a redacted version of this Opposition as soon as practicable.

4       Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms in the remainder of this Objection.

REDACTED COPY

security interest in FSS's property, assets, future revenues and proceeds is valid. But not only has an independent, court-ordered investigation concluded that PQPR's secured claim is ***not*** valid, this very adversary proceeding was initiated to challenge the Security Agreement as a fraudulent transfer. Moreover, despite the Connecticut Families serving discovery requests on this and other topics, Defendants have failed to produce documents concerning the negotiation of the highly irregular Security Agreement or related Promissory Notes. As chronicled in the accompanying Declaration of Jonathan Day, Defendants' positions on discovery have ranged from uncooperative, at best, to downright obstructionist—including frequently failing to respond to correspondence; then repeatedly asking what documents the Connecticut Families had not received, even after being told in writing three times what those documents included; and finally providing a (completely unsatisfactory) response just 12 hours before this brief was due.

3.        ***Second***, the Motion provides ***no admissible evidence*** to substantiate the amount of the Alleged Claim, which Defendants assert is $6.3 million. The threadbare supporting affidavits filed with the Motion—by their own admission—rely upon accounting entries made, in some instances, ***more than a year*** after the alleged debt was incurred, and the supporting documents otherwise provide no meaningful documentation for the amount of the Alleged Claim. And again, Defendants have not meaningfully responded to the Connecticut Families' discovery requests that seek the underlying documentation substantiating the purported amount of the Alleged Claim.

4.        Moreover, alternative bases warrant denying summary judgment. For one, the Court should recharacterize the Alleged Claim as an equity contribution. Indeed, several factors support recharacterization: (i) PQPR's insider status, (ii) the lack of any formal lending arrangement between PQPR and FSS, (iii) PQPR's willingness to continue to lend money to FSS without repayment, (iv) the shared nature of FSS and PQPR's finances, and (v) the non-market

REDACTED COPY

terms and the timing of the Promissory Notes and the Security Agreement.   In addition, the Court can equitably subordinate the Alleged Claim given that PQPR—as an alter ego of FSS—caused FSS to incur over $60 million in purported secured debt, at the direct expense of the Sandy Hook Families.

5.      Ample grounds therefore exist to deny the Motion outright.  In the alternative, the Court should at least grant a continuance of the Motion under Federal Rule of Civil Procedure 56(d) to allow the essentially non-existent factual support for the Alleged Claim to be further explored.   Indeed, the circumstances here are the quintessential case for a continuance, which courts grant "liberally" where discovery is incomplete.

6.      Finally, the Motion is also procedurally improper because it seeks summary judgment where no party has brought an underlying claim seeking that same relief.  FSS has a complaint in this case but PQPR has filed no counterclaim, so as a matter of basic procedural law, it is not entitled to summary judgment on that non-existent counterclaim.

7.      The Sandy Hook Families respectfully request that the Court decline to sanction Defendants' Hail Mary attempt to siphon funds away from FSS's creditors to Jones and his family.

**Relevant Factual Background**

8.      Free Speech Systems LLC ("FSS") was formed on November 16, 2007.  Alexander E. Jones ("Jones") is its sole member and 100% equity owner.  ███ ███ ███   Jones and members of his family hold interests in several other entities that conducted business with FSS. One of these entities is defendant PQPR Holding Limited LLC ("PQPR"), which is majority owned by Jones, minority owned by Jones's parents, and managed by Jones's father, David Jones ("Dr.

---

[5]     Citations in the form of Day Ex. _ and Day Decl. _ refer to exhibits to the accompanying Declaration of Jonathan Day, filed contemporaneously herewith.

REDACTED COPY

Jones"). FSS Compl. ¶¶ 20–21.

9.      The Sandy Hook Families filed lawsuits in Connecticut and Texas in 2018 based on false and defamatory statements made by Jones and FSS in the wake of the Sandy Hook Elementary School shooting. FSS Compl. ¶ 28. Only after lawsuits were pending—and after the Texas court denied Jones's motion to dismiss the case and ordered Jones and FSS pay $100,000 in attorneys' fees,[6]—Jones and PQPR begun documenting "debt" that FSS purportedly owed to PQPR on account of products that PQPR had "purchased and paid for" from "third parties." Mot. ¶ 10.

10.     On August 13, 2020, FSS and PQPR purportedly executed a promissory note in the principal amount of $29,588,000 made payable to PQPR, ostensibly to memorialize obligations accrued through December 31, 2018 (the "2020 Promissory Note"). *See Affidavit of Robert Roe* [Docket No. 44-1] (the "Roe Affidavit"), Ex. 1. Contemporaneously, FSS purportedly executed a security agreement granting PQPR a lien on all assets and future income of FSS (the "Security Agreement"). *See* Roe Aff. Ex. 2. The Security Agreement is signed by Jones on behalf of FSS, and his father, Dr. Jones, on behalf of PQPR—again, a company that was both then and now majority-owned by Jones himself. PQPR states that the Security Agreement supposedly secured the 2020 Promissory Note and other obligations "now owed or hereafter arising." Mot. ¶ 20.

11.     In late 2021, the Connecticut and Texas state courts entered default judgments against Jones and FSS due to their repeated and serious failures to comply with court orders. FSS Compl. ¶ 34. On November 10, 2021—a month and a half after the Texas default judgment and just five days before the Connecticut default judgment—FSS and PQPR entered into a second promissory note in a principal amount of $25,300,000 made payable to PQPR, which allegedly

---

[6] *See Heslin* v. *Free Speech Systems LLC*, Case No. D-1-GN-19-004651 (Tex. Dist. Travis Cnty. Dec. 20, 2019).

REDACTED COPY

memorialized obligations of FSS to PQPR from January 1, 2019 through December 31, 2020 (together with the 2020 Promissory Note, the "Promissory Notes").

12.     On July 29, 2022 (the "Petition Date"), FSS filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

13.     Upon the Court's request, the subchapter V trustee appointed in this case (the "Subchapter V Trustee") investigated the validity of PQPR's asserted secured claim, based on the Promissory Notes, against FSS.  On April 4, 2023, the Subchapter V Trustee issued the *Subchapter V Trustee's Initial Findings of Free Speech Systems, LLC Investigation* [Docket No. 549] (the "Subchapter V Trustee Report").  The Subchapter V Trustee's Report chronicles how there were "numerous instances of financial gymnastics by Alex Jones and Dr. David Jones—presumably to some end"; how "FSS and PQPR did not transact at arm's length" and "observation of corporate formalities was virtually non-existent"; how their subsequent "sudden enforcement" of alleged intercompany debt "appears to be a preparatory action and an attempt to legitimize the debt"; and how it was even "difficult to view FSS and PQPR as anything but one entity."  Subchapter V Trustee's Report at 2, 12, 13, 21.  More specifically, among other conclusions and observations, the Subchapter V Trustee's Report:

- Discusses that "FSS and PQPR historically operated using the same cash management system, physical locations, computer systems, and common employee base."  Subchapter V Trustee's Report at 11.[7]

---

[7]     Although Defendants have stymied the Connecticut Families' discovery efforts, *see infra* 29–31, ███████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████

REDACTED COPY

- Notes that ▮▮▮▮▮▮▮—the individual who "managed the intercompany billings between FSS and PQPR as well as their respective accounts payable and accounts receivable"—"is not an accountant" and "did not personally calculate the PQPR numbers or investigate their accuracy." Subchapter V Trustee's Report at 6, 12.[8]

- Describes FSS and PQPR's "failure to observe corporate formalities," including that they "did not transact at arm's length" and "did not have a contract, price sheet, or formal written agreement governing their relationship, including prices charged." Subchapter V Trustee's Report at 12.[9]

- Observes that the "lack of consequences for the failure of FSS to repay asserted obligations to PQPR is telling" and that the "sudden enforcement of the obligation to pay under those notes, particularly within such close proximity to [the Petition Date] . . . appears to be a preparatory action and an attempt to legitimize the debt." Subchapter V Trustee's Report at 13.

- Details Roe's "shifting" narrative around FSS and PQPR's business relationship, and discusses how Roe himself—the same Mr. Roe who submitted an affidavit on behalf of PQPR in this case against FSS—"work[ed] for both PQPR and FSS." Subchapter V Trustee's Report at 5, 13–14.[10]

- Identifies the non-market terms of the debt, including the (a) lack of clear consideration given in exchange for the debt; (b) "certainty" of an imminent default in the Promissory Notes soon after their execution; and (c) low interest rates borne by the Promissory Notes, indicating FSS and PQPR did not conduct business at arm's length. Subchapter V Trustee's Report at 18–19.

14.     Based on these observations and many others, the Subchapter V Trustee concludes that PQPR's claim "should not retain its secured status or payment priority senior or *pari passu* with creditors of FSS," and provides non-exhaustive "grounds and mechanisms" by which PQPR's

---

[8] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[9] *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[10] *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

claim should be subordinated to claims of unsecured creditors.  Subchapter V Trustee's Report at 21.

15.     On July 14, 2023, FSS commenced this adversary proceeding.  *Complaint* [Docket No. 1].  On July 31, 2023, FSS filed its amended complaint (the "<u>FSS Complaint</u>").  *Amended Complaint* [Docket No. 5].  The FSS Complaint seeks avoidance of transfers to PQPR, including granting PQPR security interests by the Security Agreement, incurring obligations to PQPR by the Promissory Notes, and additional cash transfers from FSS to PQPR.  On September 8, 2023, Defendants filed their answer to the FSS Complaint.  *See PQPR Holdings Limited LLC's, JLJR Holdings LLC's and PLJR Holdings LLC's Answer to Amended Complaint* [Docket No. 17].

16.     On July 21, 2023, the Sandy Hook Families filed the Joint Motion of the Sandy Hook Families for Entry of an Order Pursuant to Federal Rule 24 and Bankruptcy Rule 7024 Permitting Intervention in PQPR Adversary Proceeding [Docket No. 2] (the "<u>Intervention Motion</u>"), seeking intervention in this adversary proceeding.

17.     On November 27, 2023, the Court granted the Intervention Motion.  *Transcript of November 27, 2023, Hearing*, Case No. 22-60043 (CML) at 55:12–55:15.  Shortly thereafter, the Sandy Hook Families inquired as to the status of discovery and disclosures in the adversary proceeding, and were informed that no discovery, disclosures, or conference pursuant to rule 26(f) had taken place.  *See* Ex. 1.  The Sandy Hook Families made several attempts to schedule a Rule 26(f) conference, but received no response from counsel to the Defendants.  *Id.*  Rule 26(f) conferences finally took place during the week of March 18, 2024.  Day Decl. ¶ 5.

18.     On April 19, 2024, Defendants filed the Motion seeking partial summary judgment with respect to a purported $6,308,483.16 claim allegedly secured by the interests granted under the Security Agreement (the "<u>Alleged Claim</u>").  Defendants state the Alleged Claim is owed on

REDACTED COPY

account of obligations incurred by FSS after Jones and PQPR executed the Security Agreement on August 13, 2020.  Mot. ¶ 4.

19.     In support of the Motion, Defendants submit the *Affidavit of David Jones DDS* (the "Dr. Jones Affidavit") and the Roe Affidavit.  The Dr. Jones Affidavit makes a series of conclusory statements—without attaching or identifying any supporting evidence—regarding the business relationship between FSS and PQPR and the circumstances that purportedly gave rise to PQPR's secured claim.  Notably, the Dr. Jones Affidavit does not meaningfully contradict the highly critical accounts of FSS and PQPR's business relationship described in the Subchapter V Trustee Report.  The Dr. Jones Affidavit then concludes, in a single sentence paragraph, that "after the security agreement came into effect; FSS borrowed an additional $6,308,483.16 million [sic] in debt to PQPR."  Dr. Jones Aff. ¶ 14.  How Dr. Jones purports to know this to be true is not at all clear from his affidavit—he certainly does not describe spending any time or efforts calculating the amount of the Alleged Claim.  ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

20.     The Roe Affidavit is no more illuminating.  Roe is an accountant who has worked for both PQPR and FSS before, but is now working for PQPR in its litigation against FSS.  He purports to have determined the amount of the Alleged Claim based on a review of the "books and records of PQPR and FSS."  Roe Aff. ¶ 13.  But the Roe Affidavit acknowledges that Roe only "reviewed" records created by someone else—████████████, the "bookkeeper" responsible for recording both PQPR's and FSS's transactions.  Roe Aff. ¶¶ 7, 13.  ████████████████

████████████████████████████████████████

REDACTED COPY

███████████████████████████████████████████████████████

██████  ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████; *see also* Dr. Jones Aff. ¶ 9 ("[████] was continually late in making entries.").  The Roe Affidavit purports to attach "copies of [Roe's] analysis" and the "work papers underlying such analysis," but these skeletal four pages consist of nothing more than a bare ledger of transactions between PQPR and FSS and a summation of the amounts reflected in that ledger.  Roe Aff. ¶ 13; Roe Ex. 5. ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

21.     After Defendants filed the Motion, the Sandy Hook Families promptly sought discovery.  However, Defendants have refused to comply with their discovery obligations.

22.     On April 24, 2024, the Connecticut Families served discovery requests on Defendants, including requests for production, Day Ex. 2, and deposition notices directed to Mr. Roe and Mr. Jones.  Day Ex. 3, 4.  The requests for production seek documents bearing on the core disputed issues raised by the Motion, including, for example, communications concerning the negotiation of the Security Agreement and documentary support for the alleged $6 million debt.  *See* Day Ex. 2, at RFP Nos. 1 & 7.  However, to date, almost none of the documents produced by PQPR bear on those fundamental issues.  Day Decl. ¶¶ 8–23.  To be sure, the Sandy Hook Families have repeatedly raised these deficiencies to PQPR's attention.  *See id.*  But PQPR has offered no

REDACTED COPY

meaningful objection, explanation, or response.  Instead, PQPR has alternated between (a) pointing to its prior productions to the Subchapter V Trustee—which, as the Connecticut Families have repeatedly explained, do not contain documents bearing on core issues here, *see, e.g.* Day Decl. ¶¶ 10, 21; (b) ignoring the Connecticut Families' entirely, *see, e.g.*, Day Decl. ¶¶ 12–13; and (c) then providing a perfunctory response the morning this brief was due, when PQPR's counsel, among other things, admitted the existence of financial records that have not been produced, refused to send them electronically, and suggested "come review it in person."  Day Ex. 14.

23.     Because of PQPR's refusal to engage, the Sandy Hook Families were forced to take the depositions of Mr. Roe and Mr. Jones without adequate and complete document discovery. Although the Sandy Hook Families have reserved the right to bring back Mr. Roe and Mr. Jones pending additional document discovery, ██████████████████████████████████

████████████████████

24.     For example,  ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████s

REDACTED COPY

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

### Legal Standard

25.     Summary judgment is warranted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The evidence must be viewed "in the light most favorable to the non-moving party, drawing 'all justifiable inferences ... in the non-movant's favor.'"  *Renwick* v. *PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c).

### Argument

26.     Two premises underlie the Alleged Claim.  *First*, that the Security Agreement is valid and enforceable and *second*, that FSS incurred approximately $6.3 million in obligations to PQPR since August 13, 2020.  Genuine, serious disputes of material fact exist as to both of these critical premises, warranting this Court denying summary judgment.  Alternatively, ample grounds exist for this Court either recharacterizing or equitably subordinating the Alleged Claim.  Finally, significant discovery requests from the Sandy Hook Families remain unanswered—indeed, PQPR has done almost nothing but stonewall efforts to obtain discovery in this case—further warranting that the Court grant a continuance of the Motion to allow discovery on these critical points to progress.  The Motion should therefore be denied.

REDACTED COPY

**A.** **Genuine Disputes of Material Fact Exist as to the Validity and Amount of the Alleged Claim, Precluding Summary Judgment.**

     i.   The Security Agreement Underlying the Alleged Claim Is Not Valid.

27.    The Alleged Claim is entirely contingent on the validity of the Security Agreement—an agreement signed by Jones and his father, on behalf of two entities largely owned by Jones, that purported to give one of them (PQPR) an over $29 million interest in the other's (FSS's) assets and future revenues on account of purported preexisting debt, at a time when Jones and FSS were fearful of the Sandy Hook Plaintiffs' claims.  The Motion assumes the validity of the Security Agreement and the preexisting debt it allegedly secures—providing ***no facts*** to support its validity.  But several facts—and an independent, court-ordered investigation—militate against the Security Agreement's validity.  At the very minimum, this provides "evidence on which the [fact finder] could reasonably find for the [nonmovant]," precluding summary judgment.  *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *Kellerman* v. *Askew*, 541 F.2d 1089, 1092 (5th Cir. 1976) (noting that the "party opposing the motion is to be given the benefit of all reasonable doubt in determining whether a genuine factual issue exists" and that "the inferences most favorable to the party opposing the motion will be drawn").

28.    Notably, the Subchapter V Trustee, at the Court's request, investigated PQPR's supposed secured claim and unequivocally determined that it is not valid.  The Subchapter V Trustee concluded that "the PQPR Debt should not retain secured status or payment priority senior or *pari passu* with creditors of FSS.  The grounds and mechanisms for this are numerous."  Subchapter V Trustee's Report at 21.[11]  Indeed, the Subchapter V Trustee's investigation

---

[11]   The Subchapter V Trustee's Report is admissible for the truth of the statements asserted in that report as it satisfies the "public records" exception to the rule barring hearsay.  *See* Fed. R. Evid. 803(8); *see also United States* v. *Noria*, 945 F.3d 847, 852 (5th Cir. 2019) ("The public-records exception 'is designed to permit the admission into evidence of public records prepared for purposes independent of specific litigation"; "[d]ue to the lack of any motivation on the part of the recording official to do other than mechanically register an unambiguous factual

REDACTED COPY

"reveal[ed] numerous instances of financial gymnastics by Alex Jones and Dr. David Jones." *Id.* at 2.  As described therein, a plethora of facts and observations inform and support these conclusions, including PQPR and FSS's common ownership and use of systems and personnel, their failure to observe any corporate formalities (to the extent that it is "difficult to view FSS and PQPR as anything but one entity"), the non-market terms of the debt, the lack of consequences of FSS's non-payment, and PQPR's ability to operate despite non-payment by FSS.  Subchapter V Trustee's Report at 10–21.  This court-ordered investigation, by itself, presents ***significant*** facts that should cause the Security Agreement to be declared invalid, but are at the very least disputed.  *See McPherson* v. *Rankin*, 736 F.2d 175, 180 (5th Cir. 1984) ("substantial issues of material fact" precluded summary judgment).  Remarkably, PQPR does not even ***mention*** this report in its motion, let alone attempt to address it.

29.     PQPR's unexplained presumption that the Security Agreement is valid is even more egregious because FSS initiated this ***very adversary proceeding*** to challenge the granting of security interests under the Security Agreement as a fraudulent transfer.  FSS Compl. ¶¶ 53–59.  Indeed, by its Complaint, FSS alleges many facts to support that the security interest was not given for reasonably equivalent value and was designed to delay or defraud FSS's creditors, all while FSS was insolvent.  *See* FSS Complaint ¶¶ 28, 36–39.  Of course, because entering into the Security Agreement was a fraudulent transfer, the purported obligations under the agreement are void, and no obligations to PQPR are secured or entitled to priority payment.

30.     The cases that Defendants cite in their Motion do not help them.  *First National Bank of Seminole* v. *Hooper*, 104 S.W.3d 83 (Tex. 2003), stands for the proposition that a security interest is granted for reasonably equivalent value where it is made to secure a ***valid*** antecedent

matter . . . such records are [considered] inherently reliable.").

REDACTED COPY

debt. *Id.* at 85. But that is the very issue in this adversary proceeding—whether PQPR's debt is *valid*. Defendants cannot simply assume away the very issue that is the crux of this proceeding. Similarly, in *In re Applied Theory Corp.*, 323 B.R. 838 (Bankr. S.D.N.Y. 2005) the validity of the antecedent debt was not in question. *Id.* at 839. Here, where (a) Defendants have provided no admissible evidence to substantiate the supposed antecedent debt; (b) an independent, court-ordered investigation recommended subordination of the claim to unsecured creditors; and (c) FSS commenced an adversary proceeding to challenge the supposed secured claim, awarding summary judgment based on the validity of the Security Agreement would be entirely inappropriate. Moreover, while PQPR makes some conclusory statements concerning the purported provision of reasonably equivalent value, it wholly ignores FSS's claims of actual fraudulent transfers.

31.     Moreover, the Sandy Hook Families' discovery requests—to which Defendants have not properly responded—remain outstanding with respect to multiple aspects of the Security Agreement. Day Decl. ¶¶ 7–23. For example, PQPR has not meaningfully produced documents in response to requests seeking documents bearing on the validity and enforceability of the Security Agreement, such as the consideration given in exchange for granting the security interests and how the agreement was negotiated and executed. Day Ex. 2, RFP No. 1. Until this morning, PQPR had not engaged with the Connecticut Families' repeated, specific requests for clarification as to whether PQPR intends to produce additional documents, or whether PQPR (tellingly) had any such documents in its possession. Day Decl. ¶¶ 7–23. PQPR's response this morning only advised that "these [documents] have been produced," without even identifying when they were produced or the relevant Bates numbers. Day Ex. 14. Given the ongoing discovery into these critical, disputed issues, the Motion should be denied. *See Liberty Lobby, Inc.*, 477 U.S. at 250 n.5 ("[S]ummary judgment [must] be refused where the nonmoving party has not had the

REDACTED COPY

opportunity to discover information that is essential to his opposition.").  And if PQPR in fact has

no documents to produce about the negotiation of the Security Agreement or related consideration,

then the complete absence of documentation—such as any communications remotely reflective of

arm's length negotiation—is all the more reason to deny the Motion outright.

ii.    <u>Defendants Have Not Substantiated the Amount of the Alleged Claim.</u>

32.    The amount of the Alleged Claim is also hotly disputed, and the "evidence"

submitted with the Motion offers no resolution.  Indeed, not only have Defendants failed to meet

their burden to show that no material facts are in dispute, they have not provided **any** admissible

evidence establishing the amount of the Alleged Claim.[12]

33.    Roe's statements as to the amount of the Alleged Claim are unsupported and

inadmissible.  ██████████████████████████████████████████████

███████  ████████████████  ███████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████  Roe, therefore,

cannot offer lay witness testimony, as lay witnesses are not permitted to offer opinions "based on

scientific, technical, or other specialized knowledge."  Fed. R. Evid. 701(c); *see also Seitz* v.

*Envirotech Sys. Worldwide Inc.*, 2008 WL 656513, at *5 (S.D. Tex. Mar. 6, 2008) (Rule 701(c)

"prevent litigants from skirting the *Daubert* standard or the expert disclosure guidelines by

---

[12]    Defendants were never entitled to presumptive validity of PQPR's proof of claim filed in FSS's bankruptcy case, as the claims were not filed with the supporting information required by Rule 3001(c)(1) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), such as the Security Agreement or the Promissory Notes, let alone any other copies of the "writings" on which PQPR's claim is based.  In any event, because FSS has objected to PQPR's claims, they are no longer prima facie valid and PQPR bears the burden of proof. 11 U.S.C. § 502(a).

REDACTED COPY

introducing expert opinion testimony as lay opinion testimony").

34.     Nor is Roe's testimony admissible as an expert opinion.  Defendants have not
complied with the expert disclosure requirements of Bankruptcy Rule 7026 and Federal Rule of
Civil Procedure 26, which require the provision of a complete statement of opinions, as well as the
facts and data considered by the witness informing those opinions.  *See* Fed. R. Bankr. Pro. 7026;
Fed. R. Civ. P. 26(a)(2); *see also* Fed. R. Civ. P. 37(c) ("If a party fails to provide information or
identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information
or witness to supply evidence on a motion . . . .").  Even if Defendants had made appropriate expert
disclosures, nothing in Roe's affidavit or deposition testimony provides any indication that the
methodology he employed—an unspecified selection of records deemed "representative" based
purely on Roe's "judgment"—provides any suggestion of reliability, as is required for expert
testimony to be admissible.  *See Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94
(1993).

35.     The Roe Affidavit suffers from other deficiencies as well.  In particular, ▮▮▮▮▮▮▮
accounting entries—which are attached to Roe's Affidavit in Exhibit 5 and which underpin Roe's
conclusions—constitute inadmissible hearsay.  ▮▮▮▮▮ "routinely ran behind on making entries."
Roe Aff. ¶ 7.  As of mid-2020, ▮▮▮▮ had only completed the accounting through December 2018.
Roe Aff. ¶ 8; ▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, the accounting entries
attached to the Roe Affidavit do not satisfy the "business records" exception to the hearsay rule.
*See* Fed. R. Evid. 803(6)(A) (records of a regularly conducted activity satisfy exception to hearsay
rule only if the record was made "at or near in time by . . . someone with knowledge"); *United
States* v. *Strother*, 49 F.3d 869, 876 (2d Cir. 1995) (memorandum "made six months after the

REDACTED COPY

relevant events" properly excluded as hearsay); *Carrie Contractors, Inc.* v. *Blount Const. Grp. of*

*Blount, Inc.*, 968 F. Supp. 662, 666 (M.D. Ala. 1997) (accounting records made "seventeen and a

half months" late properly excluded as hearsay).

36.     The Dr. Jones Affidavit cannot cure the deficiencies in the Roe Affidavit nor does

it entitle Defendants to summary judgment on their Motion. ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████

- ███████████████████████████████████████  █████████
  ███████

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  █████████████

- ███████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████

37.     Further, the Dr. Jones Affidavit cannot provide a basis to entitle Defendants to

summary judgment ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████    ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████  █████████

REDACTED COPY



38.     Compounding these issues, Defendants have also not provided any meaningful discovery concerning the amount of the Alleged Claim.  The Sandy Hook Families have requested critical pieces of information to substantiate that amount, including documents to show the products or services provided by PQPR that are the subject of the debt, as well as invoices, purchase orders, and other financial records substantiating the Alleged Claim, and all documents and communications relating to Roe's purported analysis.  Day Ex. 2.  As with requests related to the Security Agreement, the Sandy Hook Families have repeatedly requested the production of such information and specifically identified it as absent from PQPR's productions on multiple occasions.  Day Decl. ¶¶ 8–23.  PQPR refused to substantively engage with the Sandy Hook Families until this morning, despite the fact that Roe testified extensively about the invoices, wire transfers, bank statements, and other records he considered as part of his analysis.  When PQPR finally did respond, it pointed to prior productions that did not even appear to contain any meaningful amount of the requested information, in addition to other unproduced information that it refused to provide electronically.  Day Ex. 14.  Given the Sandy Hook Families' outstanding discovery, the Motion should be denied.  *See Liberty Lobby, Inc.*, 477 U.S. at 250 n.5.

REDACTED COPY

iii.   The Alleged Claim Should Be Subordinated or Recharacterized.

39.      Given their failure to establish the validity of the Security Agreement or the amount of the Alleged Claim, as discussed above, Defendants have not demonstrated their entitlement to summary judgment.   Moreover, there are substantial grounds for either recharacterizing the Alleged Claim as equity or subordinating it—indeed, the Alleged Claim is the quintessential use case for application of these doctrines.   At a minimum, the Court should not allow the Alleged Claim until FSS's avoidance, recharacterization, and subordination claims are fully and finally resolved.  *See* 11 U.S.C. § 502(d).

a)   The Court Should Recharacterize the Alleged Claim.

40.      The Court should use its well-established power to recharacterize the Alleged Claim as an equity contribution.  This is a textbook case for recharacterization under Texas law. *See In re Lothian Oil Inc.*, 650 F.3d 539, 543 (5th Cir. 2011).  Texas courts utilize several multi-factor tests to distinguish between debt and equity.  *Id.* (citing *Arch Petroleum, Inc.* v. *Sharp*, 958 S.W.2d 475, 477 n.3 (Tex. Ct. App. 1997)).  Those factors include the parties' intent, the identity of the parties, the holder's participation in management, the corporation's ability to obtain funding from outside sources, the "thinness" of the corporation's capital structure, the risk involved in the transaction, the formal indicia of the arrangement, and the presence or absence of a fixed interest rate or maturity date.  *In re Am. Hous. Found.*, 499 B.R. 517, 536 (Bankr. N.D. Tex. 2013) (quoting *Fin Hay Realty Co.* v. *U.S.*, 398 F.2d 694, 697 (3d Cir. 1968)).  No single factor is controlling and all factors may be considered.  *In re Lothian*, 650 F.3d at 543 (quoting *Estate of Mixon* v. *U.S.*, 464 F.2d 394, 402 (5th Cir. 1972)).  These factors, however, are "only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-

20

creditor relationship." *In re Am. Hous. Found.*, 499 B.R. at 536 (quoting *Fin Hay Realty Co.*, 398 F.2d at 697).

41.     Here, the Alleged Claim should be recharacterized for at least five reasons. *First*, PQPR is an insider to FSS that shares common management through Alex Jones and Dr. Jones. *Second*, until 2020, there was no formal indicia of a lending arrangement between PQPR and FSS, *i.e.*, no fixed interest rate or maturity date. *Third*, PQPR's willingness to continue to lend money to FSS without repayment demonstrates that PQPR was not expecting to be repaid. *Fourth*, the shared nature of FSS and PQPR's finances demonstrates that PQPR intended to share in the success of FSS's business. *Fifth*, the non-market terms and the timing of the Promissory Notes and the Security Agreement also evidence that these documents were merely a last-ditch attempt to legitimize the transactions as debt as FSS and Alex Jones faced pressure from the lawsuits filed by the Sandy Hook Families.

42.     *First*, courts have recharacterized claims in cases where the alleged debtholder was an insider of the debtor, especially where the debtor was also thinly capitalized. *See In re Mangia Pizza Investments, LP*, 480 B.R. 669, 707–08 (Bankr. W.D. Tex. June 14, 2012); *see also Matter of Herby's Foods, Inc.*, 2 F.3d 128, 132 (5th Cir. 1993) ("[I]f an insider makes a loan to an undercapitalized corporation, the combination of undercapitalization and the insider loan may allow the bankruptcy court to recharacterize the loan as a capital contribution" (citing *Pepper* v. *Litton*, 308 U.S. 295, 309–10 (1939)). PQPR is unquestionably an insider of FSS. In addition to its insider status, PQPR and FSS share common management. Alex Jones and Dr. Jones had significant influence over both companies at all relevant times. *See* Subchapter V Trustee's Report at 11–12. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

REDACTED COPY

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████ FSS and PQPR are undeniably related entities whose transactions should be closely scrutinized for capital contributions disguised as debt.

43.     *Second*, the lack of any standard loan terms in FSS and PQPR's historical dealings, such as a fixed interest rate or maturity date, or documentation weighs in favor of recharacterizing debt as equity.  *See In re Mangia*, 480 B.R. at 707–08 (recharacterizing a claim where the "sole documentation" consisted "of book entries on the Debtor's QuickBooks system" and there were "no formal documents, no interest rate, and no fixed maturity date"); *see also Curry* v. *U.S.*, 396 F.2d 630, 634 (5th Cir. 1968) ("[O]ne of the normal requisites of a true debt situation is that a sum certain will be paid on a particular day."). ████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████ ████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████ Prior to 2020, these transactions were recorded as intercompany transfers.  Subchapter V Trustee's Report at 15.  The informal nature of the transactions between FSS and PQPR without

REDACTED COPY

any standard negotiation, memorialization, or agreement on the terms of the relationship weighs in favor of recharacterization.

44.     *Third*, evidence that the claimant did not expect to be repaid weighs in favor of recharacterizing debt as equity.  *See In re Mangia*, 480 B.R. at 707–08 (recharacterizing a claim where testimony showed that the claimant "had little expectation that the loans would be repaid"). From 2014 to 2020, PQPR allegedly lent FSS $54.88MM "with virtually no consequence," further evidence that the parties "did not transact at arm's length."  Subchapter V Trustee's Report at 12. PQPR admits that it continued to lend to FSS despite FSS's failure to repay the full amounts that PQPR claimed it was owed.  Mot. ¶¶ 2, 12. ██████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████

45.     The record clearly demonstrates that PQPR did not expect to be repaid for the full amounts allegedly owed by FSS.  As to the first promissory note, ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████   ██████████████████████████████████████████████████████████

█████████████████████████ And for the second promissory note, ████████████████████

REDACTED COPY

███████████████████████████████████████████████████████

███████████████████████████████████████████████

46.     *Fourth*, evidence that repayment depended on the success of the debtor's business also weighs in favor of recharacterization.  *See In re Lothian*, 650 F.3d at 544 (holding that a claim purporting to be a "loan" was an equity interest because it included payments which "depended on the success of Lothian's business").  This Court should find that, to the extent that PQPR actually advanced money to FSS throughout the years, a fact which has not been conclusively established, it did so because it expected to share in the success of FSS's business rather than expecting repayment on standard loan terms.  During this time, FSS and PQPR "collectively managed revenue generated from product sales on the InfoWars platform" and PQPR "showed the sales to FSS as revenues in the PQPR tax returns."  Subchapter V Trustee's Report at 14; Mot. ¶ 10.  ████████

███████████████████████████████████████████████████████

███████████████████████████████  Although they had no formal arrangement, PQPR apparently claims that it was entitled to 100% of the profits from FSS's sales of its products while FSS "did not appear to have any right to share in any revenue (or gross profit), formally or informally."  Subchapter V Trustee's Report at 14, 17.  ████████████████████████

███████████████████████████████████████████████████████

████  PQPR's expectation to share in the success of FSS's business rather than seek repayment on formal, documented terms weighs in favor of recharacterization.

47.     *Fifth*, courts will scrutinize the formal indicia of an arrangement to determine whether the terms truly reflect debt or equity.  *In re Lothian*, 650 F.3d at 544 (recharacterizing a debt as equity despite language of a "loan" because of the inclusion of a royalty payment); *In re Am. Hous. Found.*, 499 B.R. at 538 (holding that there were no "true debt instruments" in

REDACTED COPY

connection with "vague, ambiguous, and suspect" deals despite some formal indicia). The Security Agreement and the Promissory Notes were merely a belated attempt to legitimize the purported transactions as debt, but do not transform the equity-like substance of the Alleged Claim. PQPR admits that the need for funding from PQPR was precipitated by Alex Jones's inability to obtain loans from outside sources. Mot. ¶ 13. The Subchapter V Trustee also found that FSS was unable to obtain financing from traditional banks at this time. Subchapter V Trustee's Report at 18. In addition, the terms included in the Promissory Notes are not market. Subchapter V Trustee's Report at 18–19. ██████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████ ███████████████████

█████████████████████████████████████████████████████

██████████████████████████████████ ██████████████████ The Promissory Notes were "negotiated" between father and son as an attempt to meet a bare minimum threshold to characterize the transactions as debt for tax purposes—if PQPR could have charged a lower interest rate, it would have done so. The relationship between PQPR and FSS is precisely the type of relationship between an insider and a thinly capitalized corporation which may give rise to capital contributions disguised as debt. *See In re Mangia*, 480 B.R. at 708; *Matter of Herby's Foods, Inc.*, 2 F.3d at 132.

48.     Finally, suspect timing of the documentation of an alleged debt also supports recharacterization. *See In re JMV Holdings LLC*, 2022 WL 996372, at *14 (Bankr. E.D. Tex. Mar. 31, 2022) (recharacterizing a purported loan belatedly documented after the bankruptcy petition date as equity because it was "a fictitious attempt to create a claim and a lien"). Given the long history between the parties, the timing of the Security Agreement demonstrates their intent to

REDACTED COPY

disguise PQPR's capital contributions as bona fide debt.  PQPR sought to address FSS's alleged "nonpayment" for the first time roughly one week after a Texas judge denied dismissal of one of the lawsuits against Alex Jones and FSS.  *See* Subchapter V Trustee's Report at 12.  The Promissory Notes were executed right around the time when FSS and Jones were facing multiple lawsuits from the Sandy Hook Families and following significant developments in those lawsuits. *See* Subchapter V Trustee's Report at 17–18 ("It is difficult to accept that the establishment of the two promissory notes with PQPR were merely coincidental.").  ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  Additionally, the Promissory Notes and the Security Agreement respectively include provisions which establish that a default is triggered in the event that "a judgment in excess of $100,000, is entered against" FSS or there is "any judgement, arbitration award, fine or penalty for an amount in excess of $500,000."  Subchapter V Trustee's Report at 19.  The Subchapter V Trustee concluded that considering several default judgments had already been entered against Jones in the Sandy Hook Families' cases at the time of the second promissory note, these terms made a default "all but a certainty."  *Id.*  The Security Agreement did not transform PQPR's prior capital advances into a bona fide debt and like the rest of PQPR's claim, the Alleged Claim should be recharacterized as equity.

> b)  The Alleged Claim Should be Equitably Subordinated to the Claims of Unsecured Creditors.

49.     Alternatively, the long-applied, three-part test for equitable subordination under section 510(c) of the Bankruptcy Code is squarely satisfied with respect to the Alleged Claim. Here, PQPR and FSS (i) engaged in inequitable conduct that (ii) conferred on PQPR an unfair advantage and injured the Sandy Hook Families, and (iii) equitable subordination would be

consistent with the Bankruptcy Code.  *See Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).

50.     PQPR is an undisputed insider of FSS.  As such, it is held to a "higher standard" for purposes of the equitable subordination analysis, as courts "rigorously scrutinize[]" the dealings between a debtor and an insider.  *In re Equip. Equity Holdings, Inc.*, 491 B.R. 792, 842 (Bankr. N.D. Tex. 2013).

51.     *First*, PQPR engaged in inequitable conduct by—at a minimum—using FSS as its "alter ego."  Inequitable conduct includes (i) fraud, illegality, and breach of fiduciary duties; (ii) undercapitalization; or (iii) the claimant's use of the debtor as a mere instrumentality or alter ego.  *See id.* at 842–46.  The Subchapter V Trustee's report could not provide clearer grounds for alter ego liability:  "It is difficult to view FSS and PQPR as anything but one entity."  Subchapter V Report at 21.  Although the alter ego analysis is inherently fact and circumstance specific (precisely why it should not be decided on summary judgment), courts have often found alter ego liability on the part of parent corporations or affiliates, especially where the "affiliate was created solely to fill the needs of the parent corporation, the same premises were used by both with no sublease, no separate tax returns were filed, and checks were issued by the parent corporation to the debtor's creditors rather than to the debtor directly."  *See* 4 Collier on Bankruptcy P 510.05. Here:

- PQPR and FSS operated using the same cash management system, physical locations, computer systems, and shared a common employee base.

- A single shared login granted access to both PQPR and FSS's bank accounts, and the same individuals had access to these bank accounts and had ability to transfer funds between the accounts.

- PQPR warehoused inventory in a building leased by FSS.

- PQPR had no employees of its own.

REDACTED COPY

- ████ generally looked to Dr. Jones to approve how funds were being allocated among FSS and PQPR, and ██ would also take direction from Alex Jones and others on how to allocate the funds.

- FSS and PQPR did not transact at arms' length.

- FSS and PQPR did not have a contract, price sheet, or formal written agreement governing their relationship.

- Dr. Jones managed PQPR and had "substantial influence" over FSS.

*See* Subchapter V Report at 10–20.  Even in its motion for summary judgment, PQPR is relying almost exclusively on an affidavit of an accountant, Roe, who worked for **both** FSS and PQPR in connection with their purported debt ██ ████████████████████████████ ████████████████████████████████ Where FSS and PQPR had such a substantial operational and financial overlap—and where David Jones, PQPR's asserted manager, controlled the flow of payments from FSS to PQPR and vice versa—the "alter ego" prong of the analysis is easily met.  *See, e.g.*, *In re Bailey Tool & Mfg. Co.*, 2021 WL 6101847, at *49–50 (Bankr. N.D. Tex. Dec. 23, 2021) (finding equitable subordination appropriate where, among other factors, entity controlled debtors' purchase of basic supplies, made key business decisions, paid debtors' vendors).

52.    In addition, to the extent that—as alleged in the FSS Complaint—entry into the Security Agreement and Promissory Notes were fraudulent transfers designed to defraud creditors, this would also constitute additional "inequitable conduct" warranting subordination of the claims.  *See, e.g.*, *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412–13, 415 (3d Cir. 2009) (affirming the bankruptcy court's order for subordination where an unaffiliated third-party coerced the company to fraudulently deceive and caused "substantial damages" to creditors).

53.    *Second*, if unabated, PQPR's inequitable conduct—using FSS as its alter ego and contriving the Security Agreement and Promissory Notes—will cause severe harm to the Sandy

REDACTED COPY

Hook Families.  One needs to look no further than the Alleged Claim itself, which, by virtue of the Security Agreement, would siphon money from FSS's creditors to Jones and his parents, through PQPR, thereby causing the Sandy Hook Families to lose out on, at least, the first $6.3 million of FSS distributions.  Indeed, Defendants may argue that it should be of no moment to the Sandy Hook Families how value is allocated between FSS and Jones (as majority owner of PQPR), but this ignores the reality that if the Alleged Claim is allowed, a significant portion of the Alleged Claim would go to Jones's parents, who hold minority ownership interests in PQPR, and not to the Sandy Hook Families.  This is precisely the type of harm equitable subordination was intended to address.  *See In re Herby's Foods, Inc*., 134 B.R. 207, 212 (Bankr. N.D. Tex. 1991), *subsequently aff'd sub nom. Matter of Herby's Foods, Inc*., 2 F.3d 128 (5th Cir. 1993) (finding injury to creditors where their actions caused debtors' debt to "substantially increase"—by $3.7M—and creditors were "positioning themselves" as secured creditors to take advantage of the Bankruptcy Code's priority scheme); *In re Wolverine, Proctor & Schwartz, LLC*, 447 B.R. 1, 33 (Bankr. D. Mass. 2011) (noting misconduct arising from non-arms'-length dealings between borrowers and lenders warrants subordination).

54.    *Finally,* equitable subordination is consistent with the Bankruptcy Code.  Indeed, if the first two prongs of the equitable subordination analysis are satisfied "it is difficult to imagine a situation in which the equitable subordination would not be warranted by bankruptcy law," given that the Bankruptcy Code "expressly authorizes" equitable subordination.  *Life Partners Creditors' Tr.* v. *Black Diamond Lifeplan Fund*, 2018 WL 4076491, at *5 (N.D. Tex. June 22, 2018) (quoting *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 45–46 (Bankr. E.D.N.Y. 2006)).  Equitable subordination would simply remedy the harm that allowance of the Alleged Claim would inflict on the Sandy Hook Families, in recognition of the inequitable conduct giving rise to the Alleged

REDACTED COPY

Claim.

**B.  The Court Should, in the Alternative, Grant a Continuance of the Motion.**

55.     The Court should deny the Motion outright for all of the above reasons.  However, many of the same grounds that warrant denial of the Motion warrant a continuance under Federal Rule of Civil Procedure 56(d), made applicable to this proceeding through Federal Rule of Bankruptcy Procedure 7056, as meaningful discovery is ongoing with respect to the Security Agreement and the Alleged Claim.  Courts interpret the standard provided in Rule 56(d) liberally and provide that "[w]here the party opposing the summary judgment motion informs the court that its diligent efforts to obtain evidence from the moving party have been unsuccessful, 'a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.'"  *Int'l Shortstop, Inc.* v. *Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) (citations omitted).  More broadly, the purpose of a continuance is "to provide non-movants with a much needed-tool to keep open the doors of discovery in order to adequately combat a summary judgment motion."  *Wichita Falls Office Assocs.* v. *Banc One Corp.*, 978 F.2d 915, 919 (5th Cir. 1992); *see also Culwell* v. *City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006) (explaining that continuances "allow[] for further discovery to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose").

56.     There are three general requirements that the non-movant must establish for a continuance:  "(i) requesting extended discovery prior to the court's ruling on summary judgment; (ii) put the trial court on notice that further discovery pertaining to the summary judgment motion is being sought; and (iii) demonstrating to the trial court specifically how the requested discovery pertains to the pending motion."  *Wichita Falls*, 978 F.2d at 919 (citing *Int'l Shortstop*, 939 F.2d at 1268).  Additionally, the non-movant must have diligently pursued the relevant discovery.  *Id.* ("[W]hen a party is seeking discovery that is germane to the pending summary judgment motion

REDACTED COPY

it is inequitable to pull out the rug from under them by denying such discovery."). Courts consider discovery to be diligently pursued where the non-movants have engaged in the discovery process prior to deadlines for summary judgment. *See Culwell*, 468 F.3d at 872 (finding the plaintiffs did not lack due diligence in pursuing discovery when they filed their discovery requests prior to the end of the discovery period and deadlines for summary judgment motions). The Fifth Circuit has underscored the protections afforded to non-movants at this stage of the litigation as "[s]ummary judgment is a lethal weapon. We must afford prospective victims some protective armor if we expect them to properly defend against it." *Int'l Shortstop*, 939 F.2d at 1268.

57. A continuance, at the very least, is warranted in this case as there is pending discovery that has not yet been completed with respect to the Security Agreement and the Alleged Claim. As described throughout this Objection, the Sandy Hook Families have diligently pursued discovery in this case. The Sandy Hook Families have been actively involved in this litigation from the moment they sought to intervene and since then, have been proactive in reaching out to initiate discovery through a Rule 26 conference. Day Decl. ¶ 4; Day Ex. 1. Despite these efforts, the Rule 26 conference only took place recently and discovery has been propounded upon PQPR in the short time since then. Day Decl. ¶¶ 4–7. The Sandy Hook Families issued discovery requests seeking documents that would support both the validity of the Security Agreement and the amount of the Alleged Claim ahead of the depositions of Mr. Roe and Dr. Jones. Day Ex. 1, RFP Nos. 1 & 7. PQPR's production of documents in response to these requests were wholly inadequate. Despite the Sandy Hook Families flagging specific deficiencies in PQPR's production on multiple occasions, including the evening before Mr. Roe's deposition, PQPR did not provide responsive documents concerning the negotiation of the Security Agreement and Promissory Notes or showing the products and/or services that are purportedly the subject of the Alleged Claim prior

REDACTED COPY

to Mr. Roe's and Dr. Jones's depositions—and has not meaningfully engaged since then.  Day Decl. ¶¶ 8–23.  The discovery process is still active and ongoing at this time, including the continued deposition of Dr. Jones.  *See Int'l Shortstop*, 939 F.2d at 1268 (granting a continuance where there were several depositions outstanding).  This Court should grant a Rule 56(d) continuance to allow discovery to continue to ensure that the non-movants have "protective armor" to investigate the key facts underlying the Security Agreement and Alleged Claim prior to this Court ruling on the Motion.

### C.    The Motion Is Procedurally Improper.

58.    Finally, the Motion is procedurally improper because it seeks summary judgment on a claim that has not been pleaded—namely, FSS's request for a "judgment in favor of the Defendants that the $6,308,483.16 is secured[.]"  Mot. at 10.  But the FSS Complaint seeks no such judgment, and the Defendants have alleged no counterclaims in this adversary proceeding.  It is, of course, fundamental that summary judgment can be sought only with respect to a "claim or defense."  Fed. R. Civ. Pro. 56(a).  Because there is no "claim or defense" underlying the Motion's request for a judgment that the Alleged Claim is valid, summary judgment is inappropriate.

REDACTED COPY

Dated: May 20, 2024

**LAWSON & MOSHENBERG PLLC**
By: */s/ Avi Moshenberg*
Avi Moshenberg
State Bar No. 24083532
801 Travis Street
Houston, TX 77002
Telephone:  (832) 280-5670
E-mail:  avi.moshenberg@lmbusinesslaw.com

**CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  rstrickland@willkie.com
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

*Co-Counsel to the Texas Families*

Respectfully submitted,

**CAIN & SKARNULIS PLLC**
By: */s/  Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
E-mail:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER,
PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone:  (203) 336-4421
E-mail:  asterling@koskoff.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Paul Paterson (admitted *pro hac vice*)
Daniel Negless (admitted *pro hac vice*)
Leslie Liberman (admitted *pro hac vice*)
Jonathan Day (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
E-mail:  kkimpler@paulweiss.com
E-mail:  ppaterson@paulweiss.com
E-mail:  dnegless@paulweiss.com
E-mail:  lliberman@paulweiss.com
E-mail:  jday@paulweiss.com
E-mail:  virobinson@paulweiss.com

*Co-Counsel to the Connecticut
Families*

REDACTED COPY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Motion has been served on counsel for the Debtor, the Debtor, and all parties receiving or entitled to notice through CM/ECF on this 20th day of May, 2024.

*/s/ Ryan E. Chapple*

Ryan E. Chapple
